**Opinion issued June 21, 2012**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-11-00017-CR**

**NO. 01-11-00018-CR**

_____

**BRYANT WILLIAMS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 400th District Court**
**Fort Bend County, Texas**
**Trial Court Case Nos. 08DCR049851 &08DCR049852**

---

## MEMORANDUM OPINION

A jury convicted appellant, Bryant Williams, of the felony offenses of

money laundering[1] and possession with intent to deliver a controlled substance,

---

[1]    *See* TEX. PENAL CODE ANN. § 34.02 (Vernon 2011).

cocaine,in an amount over 400 grams, in a drug-free zone,[2] and it assessed his punishment at nine years' confinement for money laundering and seventy-three years' confinement and a $70,000 fine for possession with intent to deliver.[3]  In three issues, appellant argues that (1) the evidence supporting his convictions was insufficient; (2) the trial court erred in denying his motion to suppress evidence; and (3) the trial court erred in "stacking" his sentences rather than ordering them to run concurrently.

We affirm.

## Background

Pursuant to a search warrant, officers with the Texas Department of Public Safety ("DPS") and the Rosenberg Police Department ("RPD") searched a home at 4820 Dogwood ("the Property") and discovered over 600 grams of cocaine, $140,803 in currency, and various drug paraphernalia such as scales and baggies.

---

[2]     *See* TEX. HEALTH & SAFETY CODE ANN. § 481.102(3)(D) (Vernon 2010) (providing that cocaine is penalty group one substance); *id.* § 481.112 (a), (f) (Vernon 2010) (providing that manufacturing, delivery, or possession with intent to deliver penalty group one substance in amount over 400 grams is punishable by imprisonment for between 15 and 99 years or life and fine not to exceed $250,000); *id.* § 481.134 (c) (Vernon Supp. 2011) (providing that minimum term of imprisonment for offense punishable under section 481.112(f) is increased by five years and maximum fine is doubled if offense is committed in, on, or within 1,000 feet of school).

[3]     The charge of money laundering was tried in trial court cause number 08DCR049851 and resulted in appeal number 01-11-00017-CR.  The charge of possession with intent to deliver a controlled substance was tried in trial court cause number 08DCR049852 and resulted in appeal number 01-11-00018-CR.

The officers arrested appellant and charged him with money laundering and possession with intent to deliver a controlled substance.

Appellant moved to suppress the evidence collected pursuant to the search of the Property, arguing that the affidavit presented to the magistrate failed to demonstrate the existence of probable cause for issuing the warrant. At the suppression hearing, Sergeant P. Luna, a specialist in narcotics and drug trafficking with the DPS drug division, testified regarding the facts that he included in the affidavit he presented to the magistrate, and the trial court admitted the search warrant into evidence without objection from appellant. Sergeant Luna testified that a confidential informant who had provided reliable information to his department in the past first alerted him to appellant's possible involvement with narcotics at the Property. Sergeant Luna began to testify regarding the confidential informant's previous experience with his agency, but appellant objected on the ground that such information was irrelevant because it was not included in the affidavit. The trial court sustained the objection and admonished the State to "just stick to what is in the search warrant or the affidavit."

Sergeant Luna further testified that, in his subsequent investigation, he conducted a "trash run" at the Property, which involved his examining trash discarded by the property owner. He found "a kilogram wrapping" with an interior of clear plastic and an exterior of what appeared to be black electrical tape, and he

3

stated that the clear wrapping had a white residue on the inside "which [was] indicative of drug trafficking" in his experience. He testified that drug traffickers typically wrap packages of cocaine in this manner to protect it and to conceal it. He stated that the residue inside the wrapper recovered from the trash outside the Property field-tested positive for cocaine. He testified that the trash also included several letters addressed to appellant.

Sergeant Luna also discovered that several vehicles that were parked outside the Property were registered to appellant. The same day that he conducted the trash run, he contacted the canine unit of the RPD, and Officer D. Morales brought a dog to the property. Officer Morales took the dog around the perimeter of the house, and the dog alerted to the presence of narcotics at several locations around the doors and windows of the home. Officer Morales reported these findings to Sergeant Luna, who included them in the search-warrant affidavit.[4] Sergeant Luna testified that the magistrate issued the search warrant the next day.

On cross-examination, Sergeant Luna testified that the drugs and other paraphernalia seized were located in the master bedroom, kitchen, and crawl space above the garage, "a fair distance" from the areas around the outside of the house where the dog alerted to the presence of narcotics. Sergeant Luna also testified that the officers did not receive permission from the property owner to bring a drug

---

[4] Officer Morales also testified at the suppression hearing.

4

dog onto the Property. He further testified that the drug dog alerted to the presence of narcotics in two of the vehicles outside the Property, but no drugs were recovered from either vehicle. The trial court denied appellant's motion to suppress.

At trial, Officer Morales and Sergeant Luna testified about the investigation leading up to the search of the Property, the results of the search, and appellant's arrest. Officer Morales testified that DPS contacted him to assist in an investigation of the Property by bringing his dog to "do a sniff of the outer residence." Officer Morales testified that he presented the area along the front of the house, including the front door and windows leading to the garage area, to his dog, who alerted to the presence of narcotics. Officer Morales also testified that the officers requested that he conduct a traffic stop on appellant's vehicle for a registration violation, which he did. Morales informed appellant that "a search warrant had been secured for his residence" and placed appellant under arrest for the registration violation. He also had his dog sniff around the vehicle appellant was driving at the time of his arrest, and the dog alerted to the presence of narcotics in the car. However, appellant did not have any drugs on his person or in his vehicle at the time of his arrest. Officer Morales then returned to the Property with appellant and remained to help conduct the search.

Officer Morales testified that, while aiding with the search inside the Property, his dog alerted to the presence of narcotics in the dresser, the nightstands, and along the bed area of the largest bedroom. Morales further stated that the dog alerted to the presence of narcotics on two other vehicles parked outside the residence at the Property. On cross-examination, Officer Morales clarified that his dog was trained to detect the "odor of narcotics" and that a positive alert did not mean that actual narcotics were present in that location at that exact time. He stated that it was possible that an odor could linger for several days after some kind of contact with narcotics.

Sergeant Luna testified that he had received information that appellant was possibly involved with narcotics-related activity at the Property. Sergeant Luna began his investigation by conducting surveillance of the Property, and he observed appellant, appellant's girlfriend, Larissa Robinson, and their teenaged songoing to and from the Property on multiple occasions. He also testified that there were usually two or three vehicles parked in front of the Property and that all three of the vehicles that were typically parked at the residence were registered to appellant. He again testified regarding the trash run that resulted in the recovery of what Luna identified as a wrapper used to protect and to mask the odor of a kilogram of cocaine and several letters addressed to appellant at that Property.

6

Upon executing the search warrant, Sergeant Luna discovered narcotics in the master bedroom, including both powdered cocaine and crack cocaine. Some narcotics were in plain view on top of the dresser, and he discovered various sizes of baggies and cellophane-wrapped packages of cocaine under the bed and in the dresser. In searching the dresser, the bedroom closet, and under the bed, officers also found approximately $72,000 in currency bundled in thousand-dollar increments, baggies, measuring cups, a set of scales, duct tape, cellophane, and a microwave. Sergeant Luna testified that, in his experience, drug traffickers use measuring cups and a microwave to turn powdered cocaine into crack cocaine, and they use the scales, baggies, cellophane, and duct tape to package large amounts of cocaine into smaller amounts for distribution. He also testified that drug dealers frequently keep their cash bundled in thousand-dollar increments to allow them to keep track of the amount of money they have.

The officers discovered pictures of appellant and Robinson on the dresser, male and female clothing in the room, and various bank statements and other items in appellant's name. Using a photograph of the bedroom introduced by the State, Luna also identified a bottle of prescription medication with the name "Williams" on it.Sergeant Luna testified that he was aware of several other addresses appellant used on various documents, such as the addresses where appellant's brother and Robinson's mother lived, but he determined through his surveillance that appellant

7

lived with Robinson and their son at the Property. Sergeant Luna testified that, in his experience, drug dealers frequently used several different addresses and vehicles registered to different family members or addresses in an effort to "distance" themselves from a property where they conduct narcotics-related activities and to make it more difficult for law enforcement to locate them.

The search of the remainder of the Property uncovered approximately 3.5 grams of cocaine in the kitchen above the oven and a large bag of cash bundled in thousand-dollar increments, totaling approximately $60,000, in the garage attic. Sergeant Luna testified that the officers recovered more than $140,000 in cash and approximately 600 grams of narcotics from the Property. Sergeant Luna stated that, in his experience, that amount of drugs was indicative of intent to distribute rather thanpossession for personal use. He testified that he had contact with appellant at the time he executed the search warrant and that appellant seemed "somber, kind of expecting this day to come. . . ."

Sergeant Luna also testified about his investigation into appellant's financial records. He discovered that appellant had been employed at a concrete plant for approximately two years and eight months preceding his arrest and that, based on records from the Texas Workforce Commission,he earned approximately $117,000 during the five years leading up to his arrest. He stated that Robinson's financial records indicated that she made approximately $24,000 per year. He also testified

that appellant had a money-market account, a checking account, and a savings account in his name and that Robinson had her own separate bank account.

DPS Agent J. Moreno assisted Sergeant Luna with the search of the Property by collecting and photographing the evidence. He also testified regarding the various items of evidence collected during the investigation and search of the Property. Jonathan Salvador, a forensic chemist with DPS, testified about the testing completed on the evidence taken from the Property. His lab report showed that the total cocaine collected from the Property, not including wrappings or containers, weighed 585.38 grams.

RPD Lieutenant A. Slater testified about his experience with narcotics trafficking. Specifically, he stated that crack cocaine is generally more profitable than powdered cocaine because crack is made by mixing cocaine with another inert substance and water and cooking it, frequently using Pyrex measuring cups like the ones recovered from the Property and a microwave. He testified that the amount of cocaine recovered from the Property would be valued at approximately $9,500 to $12,500 wholesale and that it could be re-packaged and sold for anywhere between $28,311 in its pure powdered form and $169,866 in crack form. Lieutenant Slater testified that the amounts of narcotics and the type of paraphernalia found on the Property indicated someone who was a "mid-level" dealer who distributed drugs to street sellers and that he "saw nothing that was indicative" of someone who

9

maintained a stash of drugs for personal use. He also testified that, in his experience, it was common for drug dealers to "distance themselves from the drugs themselves" by utilizing "what they call a stash house or a work house or a shop that is distanced from an address that he claims" on a driver's license or other official document.

Lieutenant Slater further testified that drug dealers typically do not deposit their drug money in a bank or other financial institution, because depositing money in a bank creates a "paper trail" that might raise "red flags" and is easy to follow once an investigation is opened. Slater stated that money gained through illegal activities is usually either kept in close proximity to the person who earned it or hidden at a place thatthe earner "feel[s] comfortable that nobody else can get to and nobody else can find." He also stated that drug dealers typically bundle money in five-hundred or one-thousand-dollar stacks because its helps them keep track of the money without having to use counting machines or other more complicated methods. Finally, Lieutenant Slater testified that a drug dog alerted to the odor of narcotics on the money taken from the Property.

Finally, the State admitted a certified copy of a public document filed in the civil forfeiture case that was then pending against appellant. The document contained requests for admission, and, in it, appellant admitted that he was the sole owner of $141,103 seized on the day the officer executed the search warrant on the

Property. Appellant objected to the admission of the document on the ground that it was "fruits of the poisonous tree of . . . the illegal search and seizure of these items." The trial court overruled the objection and admitted the document.

The jury found appellant guilty of money laundering and possession with intent to deliver.

At the punishment phase, the State presented the enhancement paragraph of the indictment, which alleged that the offense of possession with intent to deliver "was committed in a drug-free zone, to-wit, within a thousand feet of premises owned, rented or leased by a school, to-wit, Terry High School. . . ." Appellant pleaded "not true" to the enhancement allegation. The State also presented evidence of appellant's two prior convictions for possession with intent to deliver.

Lieutenant Slater testified regarding the location where the offense was committed. He testified that "anything a thousand feet from a public school constitutes a drug-free zone" that can be presented to the city council for approval and certification. He further testified that, once the drug-free zone is established, it is a drug-free zone "24/7" and that it does not matter whether school was in session at the time the particular offense was committed. The trial court admitted the Rosenberg City Council's resolution certifying the area around Terry High School as a drug-free zone. Lieutenant Slater testified that his understanding, based on the survey in the resolution certifying the drug-free zone around Terry High School,

11

was that the Property fell within the drug-free zone. Slater testified that the Property was approximately five or six blocks from Terry High School.

The jury assessed appellant's punishment at nine years' confinement and no fine for the money laundering conviction. The jury found that the offense of possession with intent to deliver occurred in a drug-free zone and assessed appellant's punishment for that offense at seventy-three years' confinement and a fine of $70,000. In pronouncing appellant's sentence, the trial court stated that appellant's sentences would run concurrently.

Three days later, on December 10, 2010, the trial court held a hearing on the State's oral motion to change the trial court's ruling that the sentences would run concurrently to enter judgment that the sentences would run consecutively. The State argued that Health and Safety Code section 481.134(h) required that the sentences run consecutively because appellant was convicted of offenses under two different sections of the code. Appellant opposed the motion, arguing that Penal Code section 3.03 provides that sentences for convictions for separate offenses arising out of the same criminal episode and prosecuted together must run concurrently. Appellant also argued that he agreed to the joinder of the offenses believing that any sentences would run concurrently, and he objected to any resentencing on double-jeopardy grounds. The trial court granted the State's motion and pronounced the new sentence to appellant for the sentences to run

consecutively. The trial court then signed and entered the final judgment on the conviction for money laundering on December 13, 2010, and on the conviction for possession with intent to deliver on December 17, 2010.

## Sufficiency of the Evidence

In his first issue, appellant argues that the State failed to present sufficient evidence to support his convictions.

**A.    Standard of Review**

When reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict to determine whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979); *see also Brooks v. State*, 323 S.W.3d 893, 912 (Tex.Crim.App.2010) (holding that *Jackson* standard is only standard to use when determining sufficiency of evidence). The jurors are the exclusive judges of the facts, the credibility of the witnesses, and the weight to be given to the testimony. *Brooks*, 323 S.W.3d at 899; *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App.2000), *overruled on other grounds,Laster v. State*, 275 S.W.3d 512 (Tex.Crim.App.2009); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex.App.—Houston [1st Dist.] 2000, pet.

ref'd) (stating that jury can choose to disbelieve witness even when witness's testimony is uncontradicted). We may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the fact finder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We afford almost complete deference to the jury's determinations of credibility. *SeeLancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008). We resolve any inconsistencies in the evidence in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex.Crim.App.2000); *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App.2007) ("When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination.").

## B. Conviction for Possession with Intent to Deliver

Appellant argues that there was insufficient evidence linking him to the contraband found in this case.

To demonstrate that appellant possessed cocaine with the intent to deliver, the State was required to prove that appellant knowingly or intentionally possessed cocaine in an amount greater than 400 grams with the intent to deliver the cocaine. *See* TEX. HEALTH & SAFETY CODE ANN. §§481.102(3)(D), 481.112(a), (f) (Vernon 2010). The "intent to deliver" element may be proved by circumstantial evidence, including evidence that the accused possessed the contraband and the quantity of

14

the drugs possessed. *Moreno v. State*, 195 S.W.3d 321, 325 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd).

To prove unlawful possession of a controlled substance, the State must demonstrate that (1) the defendant exercised care, custody, control, or management over the substance; and (2) the defendant knew the matter possessed was contraband. *See* TEX. HEALTH & SAFETY CODE ANN.§ 481.002(38) (Vernon 2010); *Poindexter v. State*, 153 S.W.3d 402, 405 (Tex.Crim.App.2005). The evidence, either direct or circumstantial, "must establish, to the requisite level of confidence, that the accused's connection with the drug was more than just fortuitous." *Poindexter*, 153 S.W.3d at 405–06 (quoting *Brown v. State*, 911 S.W.2d 744, 747 (Tex.Crim.App.1995)). This rule is designed "to protect the innocent bystander from conviction based solely upon his fortuitous proximity to someone else's drugs."*Id.* at 406. Thus, when the defendant "is not in exclusive possession of the place where the substance is found, it cannot be concluded that the accused had knowledge of and control over the contraband unless there are additional independent facts and circumstances which affirmatively link the accused to the contraband." *Id.* (quoting *Deshong v. State*, 625 S.W.2d 327, 329 (Tex.Crim.App.1981)).

"The mere fact that a person other than the accused might have joint possession of the premises does not require the State to prove that the defendant

had *sole* possession of the contraband, only that there are affirmative links between the defendant and the drugs such that he, too, knew of the drugs and constructively possessed them." *Id.*; *see also Cole v. State*, 194 S.W.3d 538, 548 (Tex.App.—Houston [1st Dist.] 2006, pet. ref'd) ("The State need not prove exclusive possession of the contraband for conviction.").The State need not "exclude every reasonable hypothesis other than the defendant's guilt, but it must show facts and circumstances that, viewed in the totality of the circumstances, indicate the defendant's knowledge and control over the drugs." *Armstrong v. State*, 82 S.W.3d 444, 449 (Tex. App.—Austin 2002, pet. ref'd).

Texas courts have identified a non-exclusive list of possible "affirmative links," including (1) the defendant's presence when a search is conducted; (2) whether the contraband was in plain view; (3) the defendant's proximity to and the accessibility of the narcotic; (4) whether other contraband or drug paraphernalia was present; (5) whether the defendant owned or had the right to possess the place where the drugs were found; (6) whether the defendant was found with a large amount of cash; and (7) whether the conduct of the defendant indicated a consciousness of guilt.*Evans v. State*, 202 S.W.3d 158,162 n.12 (Tex. Crim. App. 2006).Additional link factors include a defendant's "lack of surprise or concern" during an investigation and the amount of contraband discovered. *See Fields v. State*, 932 S.W.2d 97, 104 (Tex. App.—Tyler 1996, pet. ref'd) (holding

defendant's "unnatural equanimity and lack of concern" is link factor); *Bethancourt–Rosales v. State*, 50 S.W.3d 650, 655–56 (Tex. App.—Waco 2001, pet. ref'd) (same); *Robinson v. State*, 174 S.W.3d 320, 328–29 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (considering amount of contraband).

The Court of Criminal Appeals cautioned that these factors are "not a litmus test," but are "simply some factors which may circumstantially establish the legal sufficiency of the evidence to prove a knowing 'possession.'" *Evans*, 202 S.W.3d at 162 n.12. It is not the number of links that is dispositive, but rather the logical force of all of the evidence, direct and circumstantial. *Id.* at 162. We need not consider affirmative link factors that are absent from the evidence. *Batiste v. State*, 217 S.W.3d 74, 80 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (citing *Hurtado v. State*, 881 S.W.2d 738, 745 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd)); *see also Satchell v. State*, 321 S.W.3d 127, 134 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) ("The absence of various links does not constitute evidence of innocence to be weighed against the links present.").

Here, Sergeant Luna and Agent Moreno testified that they observed appellant, his long-time girlfriend Robinson, and their teenaged child come and go from the Property on multiple occasions during their surveillance and concluded that they all lived at the Property. The officers observed that the three vehicles that were regularly parked outside the Property were all registered to appellant. They

also testified that they recovered bank statements, pictures of appellant and Robinson on the dresser, male clothing in the bedroom, and various banks statements and other items in appellant's name from the Property. Luna also identified a bottle of prescription medication with the name "Williams" in the master bedroom. The State introduced appellant's admission from the civil forfeiture case against him that he was the sole owner of the money recovered during the search and of one of the vehicles that was parked in front of the Property at the time the search warrant was executed. This evidence establishes that appellant had been present at the location where the contraband was found on multiple occasions and that he had the right to possess the place where the contraband was found. *See Evans*, 202 S.W.3d at 162 n.12 (holding that appellant's proximity to and accessibility of narcotics and whether appellant had right to possess place where drugs were found are factors linking appellant to drugs).

Furthermore, Sergeant Luna testified that some of the drugs were located in plain sight in the master bedroom and that drugs and large amounts of cash were found in several locations throughout the house. *See id.* (holding that drugs in plain view may serve as affirmative link between appellant and drugs). Several officers testified that the amount of drugs found—nearly 600 grams—exceeded any amount usually possessed for personal use. *See Robinson*, 174 S.W.3d at 328–

29 ("The power of this factor generally increases as the amount of contraband found increases. This factor, therefore, is more effective at establishing an affirmative link when large quantities of contraband are involved."). In addition to the narcotics found at the Property, the search also uncovered large amounts of cash bundled in thousand-dollar increments, which Sergeant Luna and Lieutenant Slater both testified was consistent with money obtained through drug dealing, and other paraphernalia associated with converting powdered cocaine into crack cocaine and breaking large amounts of cocaine down into smaller units for sale. *See Evans*, 202 S.W.3d at 162 n.12 (holding that presence of other contraband or drug paraphernalia and large amounts of cash may serve to link appellant to drugs). Sergeant Luna also observed that appellant did not seem surprised when the officers discovered narcotics and cash at the Property; rather, he seemed somber and as if he were "expecting this day to come."*See id.* (holding that conduct of defendant indicating consciousness of guilt may serve to link defendant to drugs); *Fields*, 932 S.W.2d at 104 (considering defendant's "lack of concern" or surprise during investigation as additional linking factor).

Appellant points out that specific affirmative links were not present: he was not present when the drugs were found, but had to be detained and taken to the residence by a police officer; he was not under the influence of drugs when he was arrested and did not possess a weapon; and he did not make incriminating

statements, attempt to flee, or make furtive gestures. However, it is not the number of affirmative links that matter, but the "logical force" that they collectively create, and we need not consider affirmative link factors that are absent from the evidence. *See Evans*, 202 S.W.3d at 162; *Batiste*, 217 S.W.3d at 80.

We conclude that the direct and circumstantial evidencewas such that the jury could have concluded that appellant's connection with the drugs was more than just fortuitous.*See Poindexter*,153 S.W.3d at 405–06. Thus, the evidence was sufficient to establish that there were affirmative links between appellant and the drugs such that he knew of the drugs and constructively possessed them.*See Poindexter*, 153 S.W.3d at 412; *see also Cole*, 194 S.W.3d at 548 ("The State need not prove exclusive possession of the contraband for conviction."); *Armstrong*, 82 S.W.3d at 449 (holding that State need not "exclude every reasonable hypothesis other than the defendant's guilt, but it must show facts and circumstances that, viewed in the totality of the circumstances, indicate the defendant's knowledge and control over the drugs").

## C.    Conviction for Money Laundering

Appellant also argues that the evidence supporting his conviction for money laundering was insufficient. A person commits the offense of money laundering if he knowingly acquires or maintains an interest in, conceals, or possesses the proceeds of criminal activity or if he conducts, supervises, or facilitates a

transaction involving the proceeds of criminal activity. TEX. PENAL CODE ANN. § 34.02(a)(1)–(2) (Vernon 2011). "Criminal activity" includes any offense that is classified as a felony in Texas. *Id.* § 34.01(1)(A) (Vernon 2011). "Proceeds" means funds acquired directly or indirectly from, produced through, or realized through an act. *Id.* § 34.01(4).

We have already concluded that the evidence was sufficient to establish that appellant committed the felony offense of possession with intent to deliver more than 400 grams of cocaine. The same evidence that we cited to affirm the jury's conclusion that appellant possessed the cocaine also serves to connect appellant to the more than $140,000 in cash seized from the Property, including appellant's own admission in the related civil-forfeiture proceeding that he was the sole owner of the currency. The testimony of Sergeant Luna and Lieutenant Slater indicated that the amount of cash found, the way that it was bundled in thousand-dollar increments, and the way in which it was hidden were indicative of money earned through illegal activity such as drug dealing. Sergeant Luna also testified that appellant had earned a total of only $117,000 through income reported by employers to the Texas Workforce Commission over the five years preceding his arrest in this case and that Robinson earned approximately $24,000 a year, and, thus, it was highly unlikely that the $140,000 in cash discovered at the Property was the result of any legitimate business.

21

We conclude that the evidence was sufficient to show that appellant knowingly possessed the proceeds of criminal activity. *See id.* § 34.02(a)(1).

We overrule appellant's first issue.

## Motion to Suppress

In his second issue, appellant argues that the trial court erred in denying his motion to suppress.

### A.    Sufficiency of Record

Appellant argues that, because the supporting affidavit was not attached to the search warrant entered into evidence by the State during the suppression hearing, the trial court "could not state that the magistrate had a substantial basis for concluding that probable cause existed to support the issuance of the warrant when viewing the affidavit because there is no affidavit."

Affidavits filed for the issuance of search warrants must provide the magistrate with sufficient information to support an independent judgment that probable cause exists for the warrant. *McFarland v. State*, 928 S.W.2d 482, 509 (Tex. Crim. App. 1996); *Weems v. State*, 167 S.W.3d 350, 356 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). In determining the sufficiency of an affidavit supporting a search warrant, a reviewing court is limited to the "four corners" of the affidavit. *McFarland*, 928 S.W.2d at 510; *Weems*, 167 S.W.3d at 356.

Generally, when the State seeks to justify an arrest on the basis of a warrant, it is incumbent on the State to produce the warrant and its supporting affidavit for inspection by the trial court. *Paulea v. State*, 278 S.W.3d 861, 864 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) (citing *Etheridge v. State*, 903 S.W.2d 1, 19 (Tex. Crim. App. 1994)). "'This requirement is imposed so that the trial court may inspect the documents and determine whether probable cause existed and ensure that the arrestee's rights have been fully protected.'" *Id.* (quoting *Etheridge*,903 S.W.2d at19).However, if a warrant is required to make a valid arrest, the State's failure to produce it at a suppression hearing does not mandate suppression of evidence. *Id.* (citing *Weems*, 167 S.W.3d at356).Rather, wedetermine whether the State introduced sufficient evidence at the suppression hearing to provide the trial court with an opportunity to determine whether probable cause existed for the accused's arrest.*Id.*; *see alsoEtheridge*, 903 S.W.2d at 19 (holding that when there was no testimony contradicting the existence of search warrant, the magistrate testified that he issued warrant, and appellant had opportunity to cross-examine as to validity of search warrant, State's failure to enter warrant itself into evidence did not prevent trial court from determining that probable cause existed for appellant's arrest); *see also Dorsey v. State*, 964 S.W.2d 701, 703–04 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) ("[W]here probable cause is otherwise established through evidence and testimony, the arrestee's rights are still protected.").

23

Here, the State introduced the search warrant into evidence without objection from appellant, but the supporting probable-cause affidavit was not attached. However, the warrant itself indicated that the affidavit existed: it expressly incorporated "the attached affidavit . . . show[ing] that Affiant has probable cause for the belief expressed therein." Appellant does not challenge that the affidavit existed and, in fact, specifically stated during the suppression hearing that the case "involves a search warrant affidavit" that he believed did not establish within its "four corners" that the magistrate could have properly found the existence of probable cause. *See Etheridge*, 903 S.W.2d at 19 (observing that "there was no testimony contradicting the existence of arrest warrant" in concluding that trial court had sufficient evidence to conclude probable cause existed). Furthermore, the affiant, Sergeant Luna, testified extensively regarding the contents of the affidavit and was subject to cross-examination by appellant. *See id.* (observing that "the magistrate testified, without objection, that he did in fact issue an arrest warrant" and that "[a]ppellant had the opportunity to cross-examine the magistrate as to the validity of the arrest warrant"); *Dorsey*, 964 S.W.2d at 704 (holding that when officer who provided affidavit testified at hearing and appellant had opportunity to cross-examine and complaint contained facts based on officer's affidavit, there was sufficient proof of probable cause for trial court to deny motion to suppress).

24

Thus, we conclude that the State's failure to produce the affidavit at a suppression hearing does not mandate suppression of the evidence; rather, wemust examine the evidence that the State introduced and determine whether it was sufficient to provide the trial court with an opportunity to determine whether probable cause existed for the search. *See Paulea*, 278 S.W.3d at 864.

## B. Standard of Review

Appellant argues that the affidavit was insufficient to support the search warrant, and, thus, the trial court erred in denying his motion to suppress.

We review a trial court's ruling on a motion to suppress using a bifurcated standard of review. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *McKissick v. State*, 209 S.W.3d 205, 211 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). We give almost total deference to the trial court's determination of historical facts that depend on credibility, and we conduct a de novo review of the trial court's application of the law to those facts, including the trial court's application of the law of search of seizure and probable cause. *Carmouche*, 10 S.W.3d at 327. Our review of an affidavit in support of a search warrant, however, is not de novo; rather, we give great deference to the magistrate's determination of probable cause. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S. Ct. 2317, 2331 (1983); *McKissick*, 209 S.W.3d at 211.The test for determination of probable cause is whether the magistrate had a substantial basis for concluding that a search would

25

uncover evidence of wrongdoing. *Gates*, 462 U.S. at 236, 103 S.Ct. at 2331; *McKissick*, 209 S.W.3d at 211. Probable cause to support the issuance of a search warrant exists when the facts submitted to the magistrate are sufficient to justify a conclusion that the object of the search is probably on the premises to be searched at the time the warrant is issued. *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986); *McKissick*, 209 S.W.3d at 211.

To justify the issuance of a search warrant, the affidavit submitted in support must set forth facts sufficient to establish probable cause that (1) a specific offense has been committed; (2) the specifically described property or items to be searched for or seized constitute evidence of that offense; and (3) the property or items constituting such evidence is located at the particular place to be searched. TEX. CODE CRIM. PROC. ANN. art.18.01(c) (VernonSupp. 2011); *McKissick*, 209 S.W.3d at 211. Whether the facts mentioned in the affidavit are adequate to establish probable cause depends on the totality of the circumstances. *Ramos v. State*, 934 S.W.2d 358, 362–63 (Tex.Crim.App.1996); *McKissick*, 209 S.W.3d at 211.

## C.    Sufficiency of the Affidavit to Establish Probable Cause

Here, Sergeant Luna testified regarding the facts he related in his affidavit. He testified that he began his investigation based on information from a confidential informant who had given reliable information to his agency in the past. He testified that he conducted a trash run, in which he searched trash placed

on the curb in front of the Property and discovered a clear wrapper covered in black electrical tape that he believed was consistent with the type of packaging used to protect and conceal a kilogram of cocaine. The residue on this wrapper field-tested positive for cocaine. He further testified that a trained drug dog alerted to the odor of narcotics at multiple places along the front of the Property. Sergeant Luna testified that he searched the trash and called in the drug dog on the same day and that he drafted the affidavit and search warrant seeking to search the Property and seize any drugs or other contraband located there on the very next day.

Thus, Luna's testimony regarding the contents of his affidavit submitted in support of the search warrant established facts sufficient to demonstrate probable cause that the offense of possession of cocaine had been committed at the specific property that was the subject of the search warrant and that contraband items and other paraphernalia constituting evidence of that offense were located at that property. *See* TEX. CODE CRIM. PROC. ANN. art.18.01(c); *McKissick*, 209 S.W.3d at 211. We conclude that probable cause to support the issuance of a search warrant existed because the facts submitted to the magistrate—as represented by Sergeant Luna's uncontested testimony—are sufficient to justify a conclusion that narcotics and other contraband were probably on the Property at the time the warrant was issued. *Cassias*, 719 S.W.2d at 587; *McKissick*, 209 S.W.3d at 211 (holding that duty of reviewing court is simply to determine whether, considering

27

totality of circumstances, magistrate had substantial basis for concluding that probable cause existed to support issuance of warrant).

We overrule appellant's second issue.

## Sentencing Error

In his third issue, appellant argues that the trial court erred in ordering that his sentences run consecutively rather than ordering the sentences to run concurrently. Specifically, he argues that they should run concurrently because the State sought the joinder of the offenses and prosecuted them as one criminal episode.

On appeal, appellant does not challenge the jury's finding that he committed the offense of possession with intent to deliver a controlled substance in a drug-free zone. Rather, he argues that the trial court abused its discretion by applying Health and Safety Code section 481.134(h), addressing drug-free zones, in determining whether his sentences should run consecutively or concurrently. He argues that his sentence should be controlled by Penal Code section 3.03 and Health and Safety Code section 481.132.[5]

---

[5] Health and Safety Code section 481.132(d) provides that if a defendant is convicted of "more than one offense arising out of the same criminal episode" prosecuted in one trial, then the sentences for the defendant's convictions must run concurrently. TEX. HEALTH & SAFETY CODE ANN. § 481.132(d) (Vernon 2010); *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2007). Section 481.132(a) provides that "criminal episode" means the commission of two or more offenses under Chapter 481, the Texas Controlled Substances Act, under certain

We interpret a statute in accordance with the plain meaning of its language, unless the language is ambiguous or the plain meaning leads to absurd results that the legislature could not possibly have intended. *Williams v. State*, 253 S.W.3d 673, 677 (Tex. Crim. App. 2008);*Thompson v. State*, 236 S.W.3d 787, 792 (Tex. Crim. App. 2007).

Penal Code section 3.03 requires that, except in circumstances not applicable here, "[w]hen an accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, a sentence for each offense for which he has been found guilty shall be pronounced" and such sentences "shall run concurrently." TEX. PENAL CODE ANN. § 3.03 (Vernon 2010).

Health and Safety Code section 481.134(h) provides that "[p]unishment that is increased for a conviction for an offense listed under this section may not run concurrently with punishment for a conviction under any other criminal statute." TEX. HEALTH & SAFETY CODE ANN. § 481.134(h) (Vernon Supp. 2011). The Court of Criminal Appeals has held:

> It is apparent from the language of this statute that a conviction for an offense listed anywhere within [section] 481.134 cannot run concurrently with a conviction for an offense under any *other* criminal statute. Just reading the statute under the auspices of common usage

circumstances. TEX. HEALTH & SAFETY CODE ANN. § 481.132(a). However, appellant was only charged with one offense under Chapter 481—money laundering is an offense under Penal Code section 34.02. Thus, Health and Safety Code section 481.132(d) does not apply to appellant's case.

29

and grammar, "any other criminal statute" means a criminal statute not listed within [section] 481.134.

*Williams*, 253 S.W.3d at 678 (observing that "we give exclusive effect of a specific provision over a more general provision . . . when the two irreconcilably conflict") (citing TEX. GOV'T CODE ANN. § 311.026(b) (Vernon 2005)).

In *Newman v. State*, the Amarillo Court of Appeals addressed the conflict between the provisions of Penal Code section 3.03 and Health and Safety Code section 481.134(h) in a case where the appellant was convicted in the same trial for possession of a controlled substance in a drug-free zone and for engaging in organized criminal activity.268 S.W.3d 266, 268–69 (Tex. App.—Amarillo 2008, pet. ref'd).The *Newman* court "follow[ed] the admonishment in *Williams* that the specific must control over general" in concluding that, because section 481.134(h) covered the specific circumstances in the case, "the trial court had no option but to order that the sentences run consecutively." *Id.* at 269.

Here, appellant was convicted in one trial of an offense listed in section 481.134—possession with intent to deliver under section 481.112(f) within a drug-free zone—and another offense under the Penal Code—money laundering.  As in *Newman*, we conclude that section 481.134 addresses the specific circumstances of this case and must control over the more general provision in Penal Code section 3.03.  *See id.*  The plain language of section 481.134 provides that a conviction for an offense listed anywhere within section 481.134 cannot run concurrently with a

30

conviction for an offense under any other criminal statute—i.e., a criminal statute not listed in section 481.134, such as money laundering under Penal Code section 34.02. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.134(h); *Williams*, 253 S.W.3d at 678.

We conclude that Health and Safety Code section 481.134(h) requires that appellant's sentences run consecutively.

Appellant also argues that "the trial court lacked authority to cumulate his sentences more than 3 days after pronouncing his sentence . . . because the trial court did not orally order cumulation when sentencing Appellant on December 7, 2010." Appellant cites *Ex Parte Madding*, 70 S.W.3d 131 (Tex. Crim. App. 2002) and *State v. Aguilera*, 165 S.W.3d 695 (Tex. Crim. App. 2005) to support his contention.

In *Aguilera*, the trial court modified the defendant's sentence just a few minutes after it had initially sentenced him and before it adjourned for the day. 165 S.W.3d at 697. The Court of Criminal Appeals held that the trial court acted within its authority, stating:

> At a minimum, a trial court retains plenary power to modify its sentence if a motion for new trial or motion in arrest of judgment is filed within 30 days of sentencing. We hold that a trial court also retains plenary power to modify its sentence if, as in this case, the modification is made on the same day as the assessment of the initial sentence and before the court adjourns for the day. The re-sentencing must be done in the presence of the defendant, his attorney, and counsel for the state.

31

*Id.* at 697–98. The Court of Criminal Appeals also expressed its approval of other cases in which the defendants were resentenced after the day of the original sentencing. *Id.* at 698 n.7 (citing *Junious v. State*, 120 S.W.3d 413, 417 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding trial court was authorized to alter appellant's sentence fifteen days after original sentencing but within time of its plenary jurisdiction) and *Ware v. State*, 62 S.W.3d 344, 353–55 (Tex. App.—Fort Worth 2001, pet. ref'd) (holding trial court was authorized to correct mistake in entering void judgment by resentencing defendant twelve days after original sentencing)).

Furthermore, a court has power to correct, modify, vacate, or amend its own rulings, including the sentence, within the time of its plenary jurisdiction. *See Awadelkariem v. State*, 974 S.W.2d 721, 728 (Tex. Crim. App. 1998) (holding that "an order granting or denying a motion for new trial may be freely rescinded so long as such action occurs within the 75 days provided by the rules"); *Meineke v. State*, 171 S.W.3d 551, 558 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (noting trial court can, in interest of judicial economy, exercise its plenary power to correct illegal sentence by modifying, vacating or amending its rulings); *Junious*, 120 S.W.3d at 417 (holding trial court was authorized to alter appellant's sentence within the time of its plenary jurisdiction).

Here, the trial court had not yet signed the final judgments at the time it modified appellant's sentence, and neither party contests that the trial court had plenary jurisdiction at the time it resentenced appellant, three days after the original sentencing. The resentencing was done in the presence of appellant, his attorney, and counsel for the State. *See Aguilera*,165 S.W.3d at 698; *Madding*, 70 S.W.3d at 136 (holding written judgment modifying sentence outside defendant's presence and after oral pronouncement was not void but was reversible because defendant's due process was violated). Furthermore, the Court of Criminal Appeals expressly approved *Ware*, in which the Fort Worth Court of Appeals held that the trial court was authorized to correct its mistake in entering a void judgment by resentencing defendant twelve days after the original sentencing. *See Aguilera*, 165 S.W.3d at 698 n.7 (citing *Ware*, 62 S.W.3d at 353–55). Thus, we conclude that the trial court had authority to correct its original, mistaken pronouncement that appellant's sentences should run concurrently.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

33

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Do not publish. TEX. R. APP. P. 47.2(b).